J-A31039-14

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN RE: ADOPTION OF: K.M.P., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: T.M.P., MOTHER | No. 883 MDA 2014 |

Appeal from the Decree Entered April 21, 2014,
in the Court of Common Pleas of Huntingdon County
Orphans'Court at No: CP-31-OC-2-2014

BEFORE:   BOWES, OTT, and STABILE, JJ.

MEMORANDUM BY STABILE, J.:                **FILED JANUARY 12, 2015**

T.M.P. (Mother) appeals from the decree entered April 21, 2014, in the Court of Common Pleas of Huntingdon County, which involuntarily terminated her parental rights to her minor daughter, K.M.P. (Child), born in October of 2011.[1]  We affirm.

At the time Child was born, Mother was incarcerated in a state correctional institution.  Two days after birth, Child was placed in the care of her paternal Great-Aunt, R.L.L. (Great-Aunt).  Great-Aunt later married R.D.S. (Great-Uncle), who assists her in raising Child.  Great-Aunt and Great-Uncle filed petitions to involuntarily terminate the parental rights of Mother and Father to Child on February 12, 2014.  Great-Aunt and Great-Uncle filed a report of intention to adopt Child that same day.  A hearing was

---

[1] The orphans' court issued a separate decree, also entered April 21, 2014, which terminated the parental rights of Child's father, D.E.L. (Father). During the termination hearing in this matter, Father agreed to relinquish his parental rights voluntarily.  N.T., 4/16/14, at 6-8.  On appeal, Father has submitted a brief as an appellee, in which he argues in support of the termination of Mother's parental rights.

held on April 16, 2014, during which the orphans' court heard the testimony of Father; Great-Aunt; Great-Uncle; Mother; and Great-Aunt's Sister-in-Law, L.M.L. (Sister-in-Law). The court also heard a statement from Child's guardian *ad litem*.

Following the hearing, on April 21, 2014, the orphans' court involuntarily terminated the parental rights of Mother to Child. On May 20, 2014, Mother filed a notice of appeal. Mother failed to concomitantly file a concise statement of errors complained of on appeal, as required by Pa.R.A.P. 1925(a)(2)(i). By order dated May 21, 2014, the orphans' court instructed Mother to file a concise statement. Mother complied on June 3, 2014.[2]

Mother now raises the following issue for our review.

> The question before this Court is whether [Great-Aunt and Great-Uncle] overcame the evidence indicating that they and their family members actively prevented [Mother] from contacting [Child], and proved by clear and convincing evidence that, for a period of at least six months immediately preceding the filing of the petition, [Mother] either evidenced a settled purposes of relinquished parental claim to her daughter [Child], or refused or failed to perform parental duties.

---

[2] As Great-Aunt and Great-Uncle have not claimed any prejudice as a result of this late filing, we have accepted Mother's concise statement in reliance on our decision in *In re K.T.E.L.*, 983 A.2d 745, 748 (Pa. Super. 2009) (holding that an appellant's failure to strictly comply with Pa.R.A.P. 1925(a)(2)(i) did not warrant waiver of the appellant's claims, as there was no prejudice to any party). *Cf. J.P. v. S.P.*, 991 A.2d 904, 908 (Pa. Super. 2010) (stating that, where the appellant not only failed to simultaneously file a concise statement with her notice of appeal but also failed to comply with the trial court's order to file concise statement within 21 days, she waived her issues on appeal).

Mother's Brief at 3.

We consider Mother's claim mindful of our well-settled standard of review.

> The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

Termination of parental rights is governed by Section 2511 of the Adoption Act, 23 Pa.C.S.A. §§ 2101-2938, which requires a bifurcated analysis.

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

J-A31039-14

***In re L.M.***, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

In this case, the orphans' court terminated Mother's parental rights pursuant to Sections 2511(a)(1) and (b), which provide as follows.

**(a) General Rule**.—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

(1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

\*\*\*

**(b) Other considerations.—**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(1), (b).

We first address whether the orphans' court abused its discretion by terminating Mother's parental rights pursuant to Section 2511(a)(1). To meet the requirements of this section, "the moving party must produce clear and convincing evidence of conduct, sustained for at least the six months prior to the filing of the termination petition, which reveals a settled intent to relinquish parental claim to a child or a refusal or failure to perform parental

- 4 -

duties." ***In re Z.S.W.***, 946 A.2d 726, 730 (Pa. Super. 2008) (citing ***In re Adoption of R.J.S.***, 901 A.2d 502, 510 (Pa. Super. 2006)). The court must then consider "the parent's explanation for his or her conduct" and "the post-abandonment contact between parent and child" before analyzing Section 2511(b). ***Id.*** (quoting ***In re Adoption of Charles E.D.M.***, 708 A.2d 88, 91 (Pa. 1998)).

This Court has emphasized that a parent does not perform his or her parental duties by displaying a "merely passive interest in the development of the child." ***In re B.,N.M.***, 856 A.2d 847, 855 (Pa. Super. 2004), *appeal denied*, 872 A.2d 1200 (Pa. 2005) (quoting ***In re C.M.S.***, 832 A.2d 457, 462 (Pa. Super. 2003), *appeal denied*, 859 A.2d 767 (Pa. 2004)). Rather, "[p]arental duty requires that the parent act affirmatively with good faith interest and effort, and not yield to every problem, in order to maintain the parent-child relationship to the best of his or her ability, even in difficult circumstances." ***Id.*** (citation omitted). Critically, incarceration does not relieve a parent of the obligation to perform parental duties. An incarcerated parent must "utilize available resources to continue a relationship" with his or her child. ***In re Adoption of S.P.***, 47 A.3d 817, 828 (Pa. 2012) (discussing ***In re Adoption of McCray***, 331 A.2d 652 (Pa. 1975)).

Instantly, Mother contends that the evidence presented at her termination hearing "indicated that [she] intended to maintain a parent-child

relationship with her daughter, and consistently expressed that intention" by writing to Child, visiting with Child on Easter of 2012, calling Great-Aunt and Great-Uncle, and expressing to Great-Aunt and Great-Uncle her desire to continue visiting with Child. Mother's Brief at 11. In so doing, Mother ultimately sought to obtain custody of Child. *Id.* Mother further claims that she "worked to overcome" the obstacles she faced that prevented her from maintaining a relationship with Child. *Id.* Specifically, Mother indicates that she attempted to call Child, but that Great-Aunt and Great-Uncle refused to accept her calls. *Id.* Mother also states she lost Great-Aunt and Great-Uncle's mailing address, and that this "not only prevented [Mother] from writing to them, but also from calling them, due to restrictions imposed by the prison." *Id.* Mother claims that she sought to retrieve the mailing address, and that she also attempted to send mail to Child through Sister-in-Law. *Id.*

Mother also argues that Great-Aunt and Great-Uncle "actively interfered" with her attempts to maintain a relationship with Child. *Id.* at 12. Mother states, for example, that Great-Aunt failed to provide Mother's mother with her mailing address when requested, refused to accept messages that Mother attempted to pass through her mother, and that Great-Aunt and Great-Uncle's family "assisted them in preventing [Mother] from having contact with [Child]." *Id.* at 12-13. Mother asserts that "[t]his Court cannot condone or allow [Mother's] rights to be terminated on the

basis of [Great-Aunt and Great-Uncle's] interference," and that the orphans' court "failed to give proper consideration" to this interference. *Id.* at 13, 19.[3]

In contrast, the orphans' court concluded that Mother "made no effort whatsoever to maintain a place of importance in [Child's] life" during the six months prior to the filing of Great-Aunt and Great-Uncle's petition to terminate. Orphans' Court Opinion, 6/16/14, at 4 (unpaginated). The court reasoned that Mother's parental responsibilities were not tolled while she was imprisoned, and that, while she "gave many excuses for her failures in maintaining a relationship with [Child]," Mother has "failed to succeed in any of her parental responsibilities." *Id.* at 4-5. The court explained that Mother's "claims of attempting to write the [C]hild but not having [Great-Aunt and Great-Uncle's] address just cannot be believed." *Id.*

Our review of the record supports the orphans' court's conclusions. At Mother's termination hearing, Great-Aunt testified that Mother has seen

---

[3] In her reply brief, Mother states that Great-Aunt and Great-Uncle's appellee brief contains various factual misstatements, and that the factual history presented in the brief should be disregarded. Mother's Reply Brief at 1-3. Mother also contends that Great-Aunt and Great-Uncle's brief does not include citations to the record in support of these misstatements, and that the brief therefore violates our Rules of Appellate Procedure. *Id.* at 3-4. Mother suggests that, "[g]iven [Great-Aunt and Great-Uncle's] failure to comply with these rules, their arguments should be deemed waived and ignored." *Id.* at 4 (citations omitted). We note that our decision to affirm the decree of the orphans' court is based upon our own thorough review of the record in this matter, and that we do not rely on the factual history or the arguments contained within Great-Aunt and Great-Uncle's brief in reaching our conclusions.

Child only once since her birth, on Easter of 2012. N.T., 4/16/14, at 10, 39. Great-Aunt acknowledged that she has received letters from Mother for Child, including one dated November 7, 2011, another from Easter 2012, and a Christmas card.[4] *Id.* at 26-29, 32-33. Great-Aunt stated that she last received a text message from Mother on April 15, 2013. *Id.* at 21. Great-Aunt indicated that Mother last attempted to call her on March 21, 2013. *Id.* at 33-34. However, Great-Aunt testified that she had not heard from Mother in the six months prior to the filing of the petition to involuntarily terminate Mother's rights on February 12, 2014. *Id.* at 10. Mother did not call, send a letter, or have someone else contact Great-Aunt on Mother's behalf during this period. *Id.* Great-Aunt and Great-Uncle were responsible for supporting Child financially during that time period, and did not receive any assistance from Mother. *Id.* at 40.

On cross-examination, Great-Aunt was asked about a letter she received from Mother, dated February 7, 2013. *Id.* at 22. In the letter, Mother indicated, *inter alia*, that she wanted to "start getting [Child] at the end of May. . . ." *Id.* at 24. Mother stated that she was "upset" and "mad" that she didn't know what Child looked like and didn't have a picture of Child until recently, and that "I can't wait until she can call me and know me as mommy." *Id.* Mother thanked Great-Aunt for her assistance, and cautioned

---

[4] Great-Aunt did not testify as to when she received the Christmas card, but Mother contends in her brief that the card was sent in 2012. Mother's Brief at 5.

that Great-Aunt would still get to see Child, and that "[s]he will always be part of you and [Great-Uncle] as long as you all don't try to take her from me in any way." *Id.* Mother asked how Child was doing, and what Child was like, and expressed her desire to call Child more often and, "as I can make more than two phone calls a week I'll be able to call more." *Id.* at 25. Mother noted that, "the last few times I called you never answered." *Id.*

Great-Aunt conceded that she disagreed with Mother's attempt to assert her status as Child's mother, and that this letter made her "furious." *Id.* at 19, 23. Great-Aunt testified that the letter upset her because, *inter alia*, Child was 17 months old at the time, and did not know Mother. *Id.* at 17. She stated, "I am not just gonna let her go with her[.] That would be like her going with a stranger." *Id.* Great-Aunt admitted that she "had no clue as to how to deal with" Mother gaining custody of Child. *Id.* She explained that she did not encourage Child to view Mother as her mother because Child was too young to understand the situation. *Id.* at 17, 35.

Great-Aunt was also asked about a series of text messages that were sent between her and Mother during March and April of 2013. In one text message, Great-Aunt complained to Mother about her letter, stating "[w]ell your letter really upset me. Seriously, [Mother]. She don't even know you. So at this point the only thing I know to do is when you get out, we go back in front of the judge." *Id.* at 15. In another text message, Mother stated that she had tried to call Great-Aunt, and that she wanted to talk about the

situation with Child. *Id.* at 18. Mother expressed concern that Great-Aunt was attempting to "get custody" of Child, and requested that Great-Aunt answer her phone. *Id.* Great-Aunt responded by saying, "[Mother], I have had custody since January 2012. You got the same paper I'm sure. I have no clue how to introduce her to you." *Id.* at 19. In a text message concerning Mother's desire to see Child on Easter of 2013, Great-Aunt stated, "Do you realize I do have custody? I've had [it] since January 2012. And [Mother], I can't even put you on speaker phone and you're saying Mommy loves you. I let it slide when she was too young to understand now she's older and thinks I am mommy." *Id.* at 20. Great-Aunt expressed concern that introducing Child to Mother "would just confuse her at this point." *Id.*

Additionally, Great-Aunt testified that she communicated regularly with Mother's mother. *Id.* at 34. Great-Aunt indicated that Mother's mother had inquired about her address "about a year ago," because "[Mother] was gonna write but she didn't have the address." *Id.* at 34-45. Great-Aunt did not provide an address because she "assumed [Mother] knew it" because "she had letters from me." *Id.* at 35. Great-Aunt explained that she had not moved or changed her address in 12 years, and that she had the same phone number for 23 years. *Id.* at 42. Great-Aunt stated that the text messages she received from Mother were sent to a phone number that she continues to possess, and that the mail she received from Mother was sent

to the same address at which she continues to reside. *Id.* Great-Aunt denied that Mother attempted to call her and was ignored. *Id.* at 34.

Mother testified that she was incarcerated at SCI Cambridge Springs at the time Child was born. *Id.* at 48. At the time of the hearing, Mother was residing at SCI Muncy. *Id.* Mother was also incarcerated in Blair County for a period of time in 2013. *Id.* at 53. Mother anticipated that she would be paroled soon after the termination hearing "[b]ecause I did everything I had to do," and stated that, upon her release, she intended to "get [Child] back." *Id.* at 52-53. Mother conceded that Great-Aunt had been caring for Child since birth, and that she did not send Great-Aunt and Great-Uncle money or gifts for Child. *Id.* at 54, 56. Mother admitted that the last time she saw Child was Easter of 2012, at her father's residence. *Id.* at 50. Mother agreed that she had no contact with Child, or contact with Great-Aunt about Child, since April 15, 2013. *Id.* at 48. Mother testified, however, that she had attempted to make contact with Great-Aunt since that date. *Id.* at 49.

Specifically, Mother explained that she "tried to get [Great-Aunt's] address off three different people. And I tried to call her three times in July," but no one answered her calls. *Id.* at 49, 51. Mother stated she intended to send Child "cards and letters and stuff," but could not do so without Great-Aunt's address. *Id.* at 49-50. Mother admitted that she had Great-Aunt's address previously, but explained that she lost it because "[w]hen I got sent back up state, I didn't have any of my stuff." *Id.* at 49.

Mother indicated that her "stuff" with the address was at her mother's home, but that her mother claimed not to have the address. *Id.* at 55-56. Mother testified that, since she could not send anything to Great-Aunt, she began sending mail for Child to Sister-in-Law, who had adopted two of Mother's other children. *Id.* at 55, 59-60. Mother indicated that she wrote a separate letter or card for Child every time she wrote to her other children who live with Sister-in-Law, but that Sister-in-Law "blocked my address like a month ago." *Id.* at 58. Mother stated that she did not know if Child ever received any of her letters or cards. *Id.* at 57.

Mother also claimed that she could not call Great-Aunt from SCI Muncy because she needed Great-Aunt's "address or birth date to add it to my phone list." *Id.* at 55. She explained that she was able to call in July of 2013 because she was incarcerated in Blair County at the time, and that in "Blair County you don't have to have an address or a birth date. You can just call the number." *Id.* at 54. Mother testified that she speaks to her mother on the phone "[e]very other week." *Id.* at 51. However, Mother claimed that she no longer tries to pass messages along to Child by way of her mother because she knew that Great-Aunt would not allow them to reach Child. *Id.*

Sister-in-Law was called to testify as a rebuttal witness. Sister-in-Law noted that Mother sent cards for Child in 2012. *Id.* at 60-61. She elaborated that the cards were received on "Christmas maybe or Easter. It

was a colored paper, like three of them. But I haven't had anything since." *Id.* at 60. Sister-in-Law admitted that she blocked mail from Mother from coming to her house in 2012, "when she went back to jail." *Id.* at 61.

In sum, the record confirms that Mother had no contact with Child during the six months prior to the filing of the petition to terminate her parental rights. While Mother was incarcerated during this time, that does not excuse Mother's failure to perform parental duties. *S.P.*, 47 A.3d at 828. While Mother claims that she could not call or write to Child directly because she lacked Great-Aunt's address, and that she attempted to send letters to Child by way of Sister-in-Law, the orphans' court was free to reject this testimony as incredible and conclude, as it did, that Mother made no effort to maintain a relationship with Child. Finally, while it is true that Great-Aunt was resistant to Mother's attempt during the spring of 2013 to assert her rights as to Child, Mother's efforts occurred prior to the critical six-month window. The record reveals that, after facing this initial resistance, Mother simply gave up and abandoned Child. We therefore conclude that the orphans' court did not abuse its discretion by terminating Mother's parental rights pursuant to Section 2511(a)(1).

Next, we consider whether termination was proper under Section 2511(b).[5] The requisite analysis is as follows.

_____

[5] Mother makes no specific argument in her brief with respect to Section 2511(b). However, in light of the requisite bifurcated analysis, we consider whether the orphans' court abused its discretion. *See In re C.L.G.*, 956

- 13 -

Subsection 2511(b) focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. In *In re C.M.S.*, 884 A.2d 1284, 1287 (Pa. Super. 2005), this Court stated, "Intangibles such as love, comfort, security, and stability are involved in the inquiry into the needs and welfare of the child." In addition, we instructed that the trial court must also discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond. However, in cases where there is no evidence of a bond between a parent and child, it is reasonable to infer that no bond exists. Accordingly, the extent of the bond-effect analysis necessarily depends on the circumstances of the particular case.

*In re Adoption of J.M.*, 991 A.2d 321, 324 (Pa. Super. 2010) (some citations omitted).

With respect to the bond analysis pursuant to section 2511(b), our Supreme Court has stated, "[c]ommon sense dictates that courts considering termination must also consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents." *T.S.M.*, 71 A.3d at 268 (citation omitted). Moreover, the court directed that, in weighing the bond considerations pursuant to section 2511(b), "courts must keep the ticking clock of childhood ever in mind." *Id.* at 269. The *T.S.M.* court observed, "[c]hildren are young for a scant number of years, and we have an obligation to see to their healthy development quickly. When courts fail . . . the result, all too often, is catastrophically maladjusted children." *Id.*

---

A.2d 999, 1010 (Pa. Super. 2008) (*en banc*) (considering Section 2511(b) despite the appellant's failure to challenge the trial court's analysis).

Here, the orphans' court concluded that it would be in Child's best interests for Mother's parental rights to be terminated. The court emphasized that Child has seen Mother only once since her birth, and that Child was "thriving" in the care of Great-Aunt and Great-Uncle. Orphans' Court Opinion, 6/16/14, at 6 (unpaginated). The court reasoned that "[a]ny decision other than to terminate parental rights would clearly be detrimental to the developmental, physical and emotional needs of [Child]." **Id.**

Again, our review of the record supports the orphans' court's decision. During the termination hearing, Great-Aunt testified that that Child "thinks I'm her Mother," and that she thinks of Child "like she is my daughter." N.T., 4/16/14, at 10-11. Great-Aunt noted that Child calls her "mom," and that they are "bonded." **Id.** at 17, 35. Great-Aunt indicated that Child has a similar relationship with Great-Uncle. Specifically, she testified that Great-Uncle treats Child "[l]ike his daughter," and that Child thinks of Great-Uncle like "[h]e is God." **Id.** at 11. Great-Aunt stated that she wished to adopt Child. **Id.** Great-Aunt testified that she no longer works, but that Great-Uncle is employed, and that they are able to continue providing for Child. **Id.** at 44.

Great-Uncle also testified, and agreed with Great-Aunt's testimony fully. **Id.** at 45. Great-Uncle explained that Great-Aunt is Child's primary caretaker, and that Great-Aunt treats Child as though she is Child's mother. **Id.** at 45-46. When asked about his own relationship with Child, Great-

Uncle stated, "I feel like she is my daughter." *Id.* at 45. Great-Uncle agreed that he and Child have a "father and child" relationship, and that Child is a "daddy's girl." *Id.* at 47. He expressed his intention to adopt Child should Mother's parental rights be terminated. *Id.* at 46.

Finally, Child's guardian *ad litem* offered his assessment. The guardian *ad litem* confirmed that Child is bonded with Great-Aunt and "hangs most especially on [Great-Uncle]. Wherever he goes she follows." *Id.* at 62. The guardian *ad litem* noted that Great-Aunt and Great-Uncle's home was "quite adequate," and expressed his support for the involuntary termination of Mother's parental rights. *Id.* at 62-63.

Thus, the testimony presented during Mother's termination hearing confirms that it would be in Child's best interest if Mother's parental rights were terminated. Given that Mother has only seen Child once since her birth, it is clear that Mother and Child have no bond. *See In re K.Z.S.*, 946 A.2d 753, 762-63 (Pa. Super. 2008) ("In cases where there is no evidence of any bond between the parent and child, it is reasonable to infer that no bond exists."). Instead, Child is bonded with Great-Aunt and Great-Uncle, who act as her parents and who have provided for her for nearly her entire life. We agree with the orphans' court that any decision other than termination would be detrimental to Child, as it would deny her a place in the only family she has ever known.

Accordingly, because we conclude that the orphans' court did not abuse its discretion by terminating the parental rights of Mother pursuant to Sections 2511(a)(1) and (b), we affirm the decree of the orphans' court.

Decree affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 1/12/2015